IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

Criminal No. 07-0135
**ELECTRONICALLY FILED**

v.

STEPHONE QUINTUIN DRAYTON, also
known as STEPHONE THOMAS, also known
as STEVEN JONES

Defendant.

**ORDER OF COURT DENYING DEFENDANT'S
MOTION TO SUPPRESS STATEMENT (DOC. NO. 50)**

**Introduction**

Defendant is charged with being a convicted felon in possession of a firearm, in violation

of 18 U.S.C. § 922(g)(1).  The Indictment charges that "[i]n and around the summer of 2005, in

the Western District of Pennsylvania, the defendant, Stephone Quinton Drayton, . . . , did

knowingly possess in and affecting interstate commerce, a .45 caliber Taurus pistol, after having

been convicted of [two offenses in 2002 in the Court of Common Pleas of Allegheny County]

punishable by imprisonment for a term exceeding one year . . . ."  Indictment (Doc. No. 2).

Before the Court is defendant's motion to suppress statements he made to investigators at

the Pennsylvania State Correctional Institute ("SCI") in Graterford, Pennsylvania, on August 9,

2006.  After careful consideration of the motion to suppress, the government's proposed findings

of fact and conclusions of law, the transcript of the suppression hearing of December 11, 2008,

and defendant's supplemental post-hearing brief in support of suppression, the Court finds that

defendant's statement was made after he had been advised of his Miranda rights, that he

implicitly waived his rights, that the waiver was knowing and intelligent, and that his statement

was voluntary.  The Court will, therefore, deny the motion to suppress.

**Suppression Hearing**

This Court conducted a suppression hearing on defendant's motion to suppress (doc. no. 50) any statements he made to investigators who interviewed him while he was in custody in a state prison facility.  Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent ("SA") Maurice Ferentino testified at the hearing about the circumstances surrounding the taking of the statement at SCI-Graterford, where defendant was serving state time for offenses against the Pennsylvania Crimes Code.  See Notes of Testimony of December 12, 2008 ("NT") (Doc. No. 80) at 4-38.

SA Ferentino and City of Pittsburgh Police Detective Steven Hitchings were investigating the August 23, 2005 shooting homicide of Aaron Eleazor in the City of Pittsburgh.  SA Ferentino testified that on December 28, 2005, a .45 caliber Taurus pistol was seized during an arrest that the Allegheny County Crime Lab ballistically matched to the firearm used to kill Mr. Eleazor. The firearm was traced back to its purchaser, Douglas Freeman, who, on March 9, 2006, told the investigators that defendant had stolen it from his residence along with his vehicle and some clothing.  Mr. Freeman also told the investigators that "he had heard that Mr. Drayton had disposed of that firearm to two black males who resided in the McKees Rocks area."  NT (Doc. No. 80) at 6-7.

After determining from his criminal history that Mr. Drayton was a potential felon in possession and tracking down his whereabouts, SA Ferentino and Detective Hitchings drove east to SCI-Graterford.  Defendant was never a suspect in the homicide, because he had been incarcerated before and at the time of the murder.  SA Ferentino testified that they met defendant

2

in a small interview room containing only a table and two chairs, somewhere at SCI-Graterford SCI. At the commencement of the interview, which was not recorded, SA Ferentino showed defendant his identification and read the standard Miranda warnings to defendant from a card that SA Ferentino always carried. SA Ferentino stated that he read the Miranda rights to defendant only because he was incarcerated, not because he was a suspect in the homicide investigation.

Defendant did not sign any written waiver of his Miranda rights. Defendant indicated he had been expecting to hear from investigators because Mr. Freeman told him about the homicide investigation and his connection with the murder weapon. SA Ferentino explained to defendant that they "weren't there to get him into any further trouble," only to get information about the homicide. *Id.* at 27-29.

The investigators laid out two photo arrays of suspects on the table for defendant to examine. Defendant refused to cooperate and refused to name the person to whom he had given or disposed of the gun; however, "he was cooperative in the fact that he admitted to his . . . association with Mr. Freeman, admitted to possession of the firearm, and admitted to getting rid of it sometime prior to his incarceration prior to, to August of 2005." *Id*. at 33.

On cross-examination, the following exchange took place:

[BY DEFENSE COUNSEL]
Q And when you got there, did you . . . and
Detective Hitchings both introduce yourself to Mr. Drayton?

[SA FERENTINO]
A Yes.
Q And you informed him you were investigating a homicide?
A Yes. In fact, your client had advised that he knew what
we were investigating because he had spoken with Mr. Freeman

3

prior to our arrival.

          *   *   *

Q Did you inform him that he was not a suspect in the
homicide?

A Yes.

Q Was that before or after you read the Miranda rights?

A After.

Q So, you, initially, read the Miranda rights to him;
correct?

A Yes.

Q Is that what was -- was that the first thing you did when
you walked in the room?

A No. We introduced ourselves to him and then, after we
told him who we were, I showed him identification. Then, I
read him his Miranda rights from the card.

Then, at that point, he was asking questions as to why
we were there. We said we would explain that to him once we
got into the room and sat down.

Once we got into the room, sat down, then we explained
exactly why we wanted to talk to him. We explained to him he
was not a suspect in the homicide.

We further explained to him that we weren't there to get
him into any further trouble. Although, he was a convicted
felon and possession of a gun is a serious crime when you are
a felon.

Q But you told him you were not there to get him into any
trouble?

A Any additional trouble. We were looking for his help as
a witness in a homicide case.

Q Did you use the term, any additional trouble?

A I don't know exactly what term we used. He was in
trouble, obviously. He was in the State penitentiary.

Q Did you explain to him that you knew he was a convicted
felon?

A Yes. I had his criminal history in front of me.

Q Did you explain to him that possessing a firearm as a
convicted felon was, was a felony?

A Yes.

Q And did he have questions for you about that?

A No.

Q Did he have questions for you about whether or not he was
a suspect?

A I believe, I believe he was worried about that. And . . . we explained to him, ad

nauseam, that he was not a suspect in the investigation.
We knew that he was incarcerated at the
time that Mr. Eleazor has been murdered and that he was not a
suspect in the case.
Q When did you discuss with him that he was a convicted
felon and that it was illegal for him to have a firearm?
A During the course of the interview. He actually
acknowledged that he knew he wasn't allowed to possess
firearms.
Q And what was that exchange? How did that exchange come
about?
A I don't exactly know the process as to how that exchange
came about, but sometime during that interview we talked about
his status as a felon and his prohibition from possession of a
firearm.
Q So, you don't remember whether it was in the beginning of
the interview or at the end of the interview?
A No. I don't. I mean, for, for the first part of the
interview, Detective Hitchings and I explained to your client
that, again, we were there for his cooperation. We weren't
there to make him, and I used this term, public enemy number
one. We were there to elicit his cooperation in our pursuit
of this homicide investigation.
Q Did you tell him that he was not going to get in trouble
for talking to you?
A No. I did not.
Q Did you inform him that he was not going to be -- that
he was not going to be prosecuted for this murder that you
were investigating?
A I don't know if we used those words, but we assured him
that at the time of the murder we knew that he was in custody
and that he wasn't a suspect.
Q Did you assure him that he was not going to be
prosecuted?
A No.

N.T. (Doc. No. 80) at 26-29.

According to SA Ferentino, defendant declined to speak to him about how the firearm left

his possession or its recipient, but he did say "that he never had that gun, and . . . that he threw it

out a window. . . .   What he said was he did not . . . have that gun to dispose of.  However, he had

5

that gun in the presence of Mr. Freeman and he had thrown that gun on a street in the Hill

District of Pittsburgh after he thought he was being pursued by Pittsburgh City Housing

Authority Police." *Id*. at 29-30.  SA Ferentino was uncertain about the timing of this statement

vis a vis discussing with defendant his criminal record as a felon.  *Id*. at 29-37.  The Notes of

Testimony discloses the following exchange between defense counsel and SA Ferentino:

> A. . . .  He refused to . . .  cooperate as to who that
> gun was disposed to. Although, he admitted
> possession of the firearm and throwing it out of a window.
> He didn't want to talk to Detective Hitchings and I as to what
> we believed really happened to that firearm.
> So, he was, counselor, he was uncooperative as to that,
> as to the reason why we were there.  However, he was
> cooperative in the fact that he admitted to his . . .
> association with Mr. Freeman, admitted to possession of the
> firearm, and admitted to getting rid of it sometime prior to
> his incarceration prior to, to August of 2005.
> Q He didn't point anybody out in the photo array?
> A He refused to talk about his associates, what group he's
> affiliated with, anything to do with the victim, anything to
> do with, with suspects. Anything like that.
> Q At what point in the interview did he do that?
> A Again, at some point during the interview.
> Q So, you don't know whether the statements that are
> written in this report were made after that point in time when
> he refused to talk to you or before that point in time?
> A He never refused to talk to us. He refused to talk
> about what we suspected happened to, really happened to that
> firearm. What he did talk to us about is his version of what
> happened to that firearm.
>
>                *   *   *
> Q And -- but you don't remember if that happened before or
> after he did talk about the other issues?
> A Again, I don't know exactly when that happened. No.
>
>                *   *   *
> Q At any time, did you inform him that, that he could get

in trouble in any way legally for not giving information about
a homicide?

A No. We never told him he can get in trouble legally for
not providing information about a homicide. No. We did not.

Q Did you ever, did you ever tell him you didn't believe
what he was telling you?

A Yes.

Q And how did that conversation go? What words did you use
when you said that?

A We said, we're not, in not so many words, Mr. Drayton,
we're not here to talk to you today about anything but the
truth. We have information that you provided the firearm to
two black males from McKees Rocks.

We're already to the point that he knows Mr. Freeman and,
and now we are, we want to know what happened to that firearm.
We explained why, and he refused to talk to us about that.
After he had told us then that he possessed the firearm,
I had his criminal record in front of me. I looked at it.
Said, you're a felon. He said, yes. I said, you're not
allowed to possess firearms. He answered, yes.

Q So, that conversation took place after he had told you
everything, basically?

A Again, we could have been back and forth as to what we
were talking about. But in the time we were in that interview
room, that conversation took place. Yes.

Q Did you, at any point during the interrogation, raise
your voice to Mr. Drayton?

A No.

Q I am sorry. Let me rephrase that.

At any point during the interrogation, did you raise your
voice to Mr. Drayton?

A No. No. Neither Detective Hitchings, nor I, did.

Q And you had also testified that you answered to some
questions that he had. What questions did you answer that he
had?

A Why were we here. You know, what are you guys doing
here? What do you want to talk to me about?

Q And was that before or after he told you that he spoke to
Freeman?

A Before.

Q Before. I mean, . . . that was his questions. They
were his questions to us. Prior to being Mirandized, prior
to entering the interview room. Prior to anything.

7

MS. COHN: Your Honor, I don't have any further
questions at this time.

N.T. (Doc. No. 80), at 33-37.

### Post-Suppression Hearing

Following SA Ferentino's direct testimony at the suppression hearing, defense counsel

made an oral motion, *id*. at 15, for any and all statements made by SA Ferentino under

Fed.R.Crim.P. 26.2, that related to the subject matter of his testimony, namely, any such

statements relating to (1) the homicide of Aaron Eleazer; (2) the dead end investigation into the

person who possessed the handgun in December 2005; (3) a suspect to the investigation who was

from McKees Rocks; (4) the interview with Freeman; and (5) Mr. Drayton's interview.

Defendant thereafter filed a Memorandum in Support of Defendant's Motion for Fed.R.Crim.P.

26.2 Material, and the government filed its response thereto.

After the suppression hearing, the government provided defendant with the August 11,

2006 report of the defendant's interview, SA Ferentino's notes leading up to and during the

defendant's interview, the police report regarding the firearm's recovery on December 28, 2005,

the lab report matching the firearm to the murder, the report of Mr. Freeman's interview and his

Grand Jury testimony.

On February 13, 2009, this Court entered a Memorandum Order granting in part and

denying in part defendant's Rule 26.2 motion for additional materials (doc. no. 50).  In this

Memorandum Order, the Court also granted Defendant's Motion for Extension of Time to File

Defendant's Motion for Additional Case Suppression Hearing and Defendant's Proposed

Findings of Fact and Conclusions of Law (Doc. No. 77).  Defendant filed his Post-Hearing Brief

in Support of Stephone Drayton's Motion to Suppress Statements (Doc. No. 79) on February 19,

2009, and the motion to suppress is ripe for decision.

### Governing Standards

The Fifth Amendment of the United States Constitution guarantees that, in a criminal

proceeding, no person will be forced to be a witness against himself.  U.S. Const. Amend. V.  To

this end, the United States Supreme Court created the Miranda warnings for law enforcement to

follow prior to custodial interrogation of a suspect.  *Miranda v. Arizona*, 384 U.S. 436 (1966).

Specifically, before any custodial questioning, the suspect must be informed that "he has a right

to remain silent, that any statement he does make may be used as evidence against him, and that

he has a right to the presence of an attorney, either retained or appointed."  *Id.* at 445. These

"warnings are constitutionally required to combat the compelling pressures inherent in custodial

police interrogation and to permit a full opportunity to exercise the privilege against

self-incrimination" guaranteed by the Fifth Amendment.  *Dickerson v. United States*, 530 U.S.

428, 440 (2000). Statements obtained in violation of Miranda, even though they may be

voluntary, are inadmissible to prove guilt at trial.  See *Michigan v. Mosely*, 423 U.S. 96, 100, 96

S.Ct. 321, 46 L.Ed.2d 313 (1975); *Miranda,* 384 U.S. at 458-59.

On a colorable motion to suppress statements as involuntary, the government must bear

the burden of proving, by a preponderance of the evidence, that a defendant was properly advised

of his Miranda rights; that the defendant voluntarily, knowingly, and intelligently waived said

rights; and that the ensuing statement was voluntary.  *Colorado v. Connelly*, 479 U.S. 157, 169

(1986). "A defendant may waive his Miranda rights if the waiver is made knowingly,

intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005).  To

9

determine that a waiver was voluntary, knowing and intelligent, two factors must be shown:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

"The voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170 (reasoning that the Fifth Amendment is solely concerned with protection from governmental coercion).  Either physical or psychological coercion by law enforcement may render a Miranda waiver involuntary.  *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.1986).  In this regard, a promise by a law enforcement officer may qualify as coercion. *United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993); *United States v. Conley*, 859 F.Supp. 830, 836 (W.D.Pa. 1994) (collecting cases).  Similarly, police words or deeds that are likely to cause a suspect to believe he will suffer serious adverse consequences if he does not cooperate, or will receive substantial leniency if he does, can render a confession involuntary. See *Walton*, 10 F.3d at 1029-30 (agent's promise that defendant could speak "off the cuff" would be understood by a suspect to mean that defendant's statements would not be used against him, rendering confession involuntary); *United States v. Veilleux*, 846 F.Supp. 149, 154-55 (D.N.H. 1994) (confession held involuntary when defendant was told that nothing he said would be used against him); *United States v. Kontny*, 238 F.3d 815, 818 (7th Cir. 2001) (investigator's promise that a suspect would not be prosecuted if he played ball could be the kind of false promise that would overcome the suspect's free will).

10

To determine the sufficiency of Miranda warnings and any waiver of rights, the Court examines the totality of the circumstances surrounding the questioning. See United States v. *Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989); *Arizona v. Fulminante*, 499 U.S. 279 (1991). In analyzing the totality of the circumstances, a court "must look at the facts of the particular case, including the background, experiences, and conduct of the suspect." *Id.* at 1086. Potential circumstances affecting the voluntariness of the statements include: 1) evidence of police coercion; 2) the length and location of the interrogation; 3) the defendant's maturity, physical condition, mental health and level of education; 4) whether Miranda warnings were given; and 5) whether an attorney was present for the interview. See *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994).

A statement may be the product of police overreaching even after a defendant has been advised of and validly waived his Miranda rights. See *Dickerson*, 530 U.S. at 444 (acknowledging that the administration of Miranda warnings does not dispense with the requirement that a statement be made voluntarily). However, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984); *Dickerson*, 530 U.S. at 444 ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."). An express written statement of a waiver is strong proof as to the validity of a waiver, of course, but a waiver may also be made orally or implied from a defendant's conduct. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

A statement is involuntary when the suspect's "will was overborne in such a way as to

11

render his confession the product of coercion." *Fulminante*, 499 U.S. at 288. Where a defendant challenges the voluntariness of a statement under the Due Process Clause of the Fifth Amendment, "the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary." *Lego v. Twomey*, 404 U.S. 477, 489 (1972); see also *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005).

**Discussion**

Defendant argues that he was coerced into rendering an inculpatory statement by the "false promise that he had nothing to lose by talking to law enforcement in this case." Defendant's Post-Hearing Brief (Doc. No. 79), at 7. In support, defendant quotes portions of SA Ferentino's testimony that defendant was told from the outset and "ad nauseam" that he was not a suspect in the murder investigation, that he was not "public enemy number one," and that Mr. Drayton would not get into "any additional trouble" by talking to the investigators. N.T. (Doc. No. 80), at 27. Thus, defendant contends that his "statements and any alleged waiver of his Miranda rights were not voluntary because they were not the product of a free and deliberate choice, but rather, were the product of false promises that he would not get into any further trouble by talking to them." Defendant's Post-Hearing Brief (Doc. No. 79), at 8.

Although defendant's argument for suppression has some appeal, given SA Ferentino's testimony that investigators told defendant they were not there to get him into any additional trouble, the Court finds that the government has met its burden of proving that defendant's statements and any waiver of his Miranda rights were voluntary and were the product of a free and deliberate choice, not of false promises. While a promise by a law enforcement officer that a suspect would not be prosecuted for anything he states to the police may qualify as coercion,

12

*Walton*, 10 F.3d at 1030; *Conley*, 859 F.Supp. at 836, SA Ferentino's "promise" that they were not there to get Defendant in any additional trouble did not amount to a promise not to prosecute. Under all of the circumstances, especially that any alleged promise was made after Defendant had been fully advised of his Miranda rights, defendant's freewill was not overridden by the investigators' conduct and statements to him, made in the context of the homicide investigation, that he was not public enemy number one and that they were not there to get him into additional trouble.

Defendant knew his Miranda rights from previous encounters with police. Defendant also knew, before the investigators arrived at SCI-Graterford, that there was an ongoing homicide investigation in which the firearm he had stolen from Mr. Freeman was the murder weapon and that investigators would be coming out to talk with him about his having had the firearm at one point and how he disposed of it, and to whom. Defendant was not, in fact, a suspect in the homicide and never was. Both investigators and defendant were aware that he was a convicted felon and was not allowed to possess a firearm. Defendant was not surprised by SA Ferentino's questioning.

**Conclusion**

Considering defendant's age, previous encounters with police officers and Miranda, the administration of Miranda warnings immediately prior to questioning, his obvious coherence and understanding of questions posed to him at the time of the interview, and the actual statements made by SA Ferentino about not being there to get him into more trouble, placed in the clear context of the homicide investigation of which he had been assured "ad nauseum" that he was not a suspect, the Court finds defendant's statements to have been voluntary, intelligent and with

13

understanding of the consequences of any statements he might make.  Accordingly,

AND NOW, this 24th day of November, 2009, for the reasons set forth above, defendant's Motion to Suppress Statements (Doc. No. 50) is HEREBY DENIED.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:     All Registered ECF Counsel and Parties